**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JENNIE SUE COX,**

**Plaintiff,**

**v.** **Case No.: 3:14-cv-16455**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

**Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable Robert C. Chambers, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 14 & 15).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's motion

for judgment on the pleadings be **GRANTED**; that the decision of the Commissioner be **AFFIRMED**; and that this case be **DISMISSED**, **with prejudice,** and removed from the docket of the Court.

## I. Procedural History

On June 14, 2011, Plaintiff Jennie Sue Cox ("Claimant"), filed an application for DIB, alleging a disability onset date of January 26, 2008, due to manic depressive or bipolar disorder. (Tr. at 232, 257). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 173, 183). Claimant filed a request for an administrative hearing, (Tr. at 186), which was held on November 6, 2012, before the Honorable Robert B. Bowling, Administrative Law Judge ("ALJ"). (Tr. at 139-70). By written decision dated November 19, 2012, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 123-34). The ALJ's decision became the final decision of the Commissioner on March 26, 2014, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of the Administrative Proceedings. (ECF Nos. 10 & 11). Claimant then filed a Brief in Support of Judgment on the Pleadings, (ECF No. 14), and the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 15). Consequently, the matter is fully briefed and ready for resolution.

## II. Claimant's Background

Claimant was 39 years old at the time that she filed the instant application for benefits, and 41 years old on the date of the ALJ's decision. (Tr. at 134, 232). She has a

high school education and communicates in English. (Tr. at 146, 256-57). Claimant has previously worked as a telemarketer, assistant manager at a fast food restaurant, and document scanner. (Tr. at 146-49, 258, 278-81).

## III. Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson*, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite

the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of

daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through September 30, 2013. (Tr. at 125, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 26, 2008. (Tr. at 125, Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the severe impairment of "mixed affective disorder (bipolar)." (Tr. at 125-26, Finding No. 3). The ALJ considered Claimant's additional potential impairments of obesity, restless leg syndrome, and drug abuse. (Tr. at 125-26). However, the ALJ found these impairments to be non-severe. (*Id.*)

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 126-28, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can only occasionally be required to use judgment on the job; work must be limited to simple routine and repetitive tasks performed in a work environment free of fast paced production requirements, involving only simple, work-related decisions and with few, if any, workplace changes; and can only occasionally interact with the public and co-workers.

(Tr. at 128-33, Finding No. 5). At the fourth step, the ALJ found that Claimant was able to perform her past relevant work as a document scanner, which the vocational expert classified as unskilled sedentary work. (Tr. at 133, Finding No. 6). Therefore, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 133-34, Finding No. 7).

## IV. Claimant's Challenges to the Commissioner's Decision

Claimant's challenges to the Commissioner's decision relate to the ALJ's analysis of opinions provided by Claimant's treating physician, Sandeep Saroch, M.D. (ECF No. 14 at 7-12). In her first argument, Claimant asserts that the ALJ violated the "treating physician rule" by "disregarding/downgrading" Dr. Saroch's opinions as to Claimant's mental RFC. (*Id.* at 7-9). Claimant specifically points to Dr. Saroch's determination that Claimant's abilities were "poor" in a number of functional areas, and she insists that Dr. Saroch's use of the term "poor" indicates "serious" or "marked" limitations in those areas. (*Id.* at 4-6, 8-9). Although the ALJ assigned "great weight" to Dr. Saroch's opinion, Claimant disagrees with the ALJ's determination that Dr. Saroch's use of the term "poor" was not synonymous with the term "marked."[1] (*Id.* at 8). Similarly, Claimant disputes the ALJ's conclusion that a finding of "marked"

[1] The undersigned presumes that Claimant adopts of the description of a "marked" limitation contained in Listing 12.00(C), which states: "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C).

limitations was not consistent with Claimant's treatment records and other opinion evidence. (*Id.* at 8-9). Claimant points out that a vocational expert testified at the administrative hearing that if Claimant possessed "marked" limitation in the functional areas described as "poor" by Dr. Saroch, then she would be precluded from maintaining any type of competitive employment. (*Id.* at 12) (citing Tr. at 169). In her second argument, Claimant contends that her reported limitations and Dr. Saroch's opinions support a finding that she meets Listing 12.04. (*Id.* at 9-12). Claimant asserts that she meets the paragraph B criteria for Listing 12.04 because she has "marked" limitations in the areas of activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (*Id.*)

In response, the Commissioner argues that the ALJ properly considered Dr. Saroch's opinions and points out that Dr. Saroch did not use the term "marked" in his assessment form. (ECF No. 15 at 10, 11 n.2). Moreover, the Commissioner asserts that the ALJ reasonably determined that a finding of "marked" limitations in any of the functional areas assessed by Dr. Saroch was not supported by the record as a whole, including Claimant's reported activities of daily living and other medical opinion evidence. (*Id.* at 11-14). Consequently, the Commissioner maintains that the ALJ's finding that Claimant does not meet the paragraph B criteria of Listing 12.04 is supported by substantial evidence. (*Id.* at 13-14). Finally, the Commissioner insists that the ALJ correctly formulated Claimant's RFC and posed an accurate hypothetical question to the vocational expert at the administrative hearing that was reflective of that RFC. (*Id.* at 14-15).

## V. **Relevant Medical History**

The undersigned has reviewed all of the evidence before the Court. The relevant

medical information is summarized as follows.

**A. Treatment Records**

Claimant began treatment with Robert S. Childers, M.D., on April 4, 2007. (Tr. at 375). At that time, Claimant complained of problems with her nerves and requested medication. (Tr. at 375). She indicated that she suffered from a panic disorder as a child and teenager; however, she never received treatment and eventually "got over it" until about one year prior to her visit. (*Id.*) Claimant reported that her husband had lost his job, which had caused financial problems. (*Id.*) She also relayed that she slept for only one hour each night and that her family history was positive for depression and anxiety. (*Id.*) Dr. Childers assessed Claimant with depression, anxiety, insomnia, probable restless leg syndrome, tobacco use, and family history of thyroid disorder as well as heart disease. (Tr. at 376). Claimant was prescribed Lexapro 10 mg and Ativan. (*Id.*)

Claimant returned to Dr. Childers one week later on April 10, 2007, reporting that her sleep had improved, but she was experiencing restless legs. (Tr. at 374). She requested a prescription for Requip, and Dr. Childers obliged after explaining the drug's side effects. (*Id.*) At an appointment with Dr. Childers approximately two weeks later, Claimant stated that she had experienced improvement using her prescribed medications. (Tr. at 371). Dr. Childers opined that Claimant's insomnia had improved, and he increased her Lexapro dosage to 20 mg daily. (*Id.*) He also prescribed Xanax in place of Ativan, which Claimant stated was making her feel tired during the day. (*Id.*) Claimant again treated with Dr. Childers on May 23, 2007, reporting that Lexapro was working well for her and that she continued to need Xanax, although she did not take it often. (Tr. at 370). Claimant was continued on her current medications and instructed

to follow up in three months. (*Id.*)

On January 23, 2008, Claimant was admitted to Our Lady of Bellefonte Hospital for treatment in the Chemical Dependency Unit. (Tr. at 359-60). Claimant provided a history of opiate abuse for the past two years. (Tr. at 359). She indicated that she had been taking sixty to eighty milligrams of Lortab and three to six milligrams of Xanax each day. (*Id.*) Claimant reported experiencing mood swings, body aches, abdominal cramps, cold chills, poor sleep and appetite, and feelings of anxiety and nervousness. (*Id.*) She was employed at the time. (*Id.*) Upon examination, Khan Matin, M.D., recorded that Claimant was cooperative and verbal although her affect and mood appeared anxious, nervous, tremulous, and depressed. (*Id.*) She denied experiencing suicidal or homicidal ideations and delusional ideas. (*Id.*) Her speech was coherent and relevant, and her intellectual level was opined to be average. (*Id.*) Dr. Matin noted that Claimant's attention, concentration, judgment, and insight were fair. (*Id.*) Claimant was diagnosed with opiate withdrawal; opiate dependence, continuous; sedative hypnotic withdrawal; sedative hypnotic dependence, continuous; and rule out bipolar under Axis I. (Tr. at 360). She was assigned a Global Assessment of Functioning ("GAF") score of twenty-eight.[2] (*Id.*) Under Axis IV, Claimant received a diagnosis of psychosocial stressors, moderate to severe due to substance withdrawal; inability to function; and mood swings. (*Id.*) Claimant was placed on Serax, Bentyl,

[2] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 32 (4th ed. 2002) ("DSM–IV"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 21 and 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home, or friends)." DSM–IV at 34.

Robaxin, Seroquel, Trileptal, and Requip. (Tr. at 357).

Claimant was discharged from Our Lady of Bellefonte Hospital three days after her admission. (Tr. at 357). Throughout her hospital course, Claimant showed improvement with no acute management problems, medication side effects, or physical distress. (*Id.*) While at the hospital, Claimant attended individual and group therapy. (*Id.*) Upon discharge, Claimant was calm, cooperative, and verbal with appropriate mood and affect. (*Id.*) Dr. Matin observed that Claimant's attention, concentration, judgment, and insight were fair. (*Id.*) Dr. Matin prescribed Seroquel, Trileptal, and Requip, and Claimant was advised to follow up with her psychiatrist. (Tr. at 357-58). Claimant's discharged diagnosis was opiate withdrawal, opiate dependence, continuous; sedative hypnotic withdrawal; sedative hypnotic dependence, continuous; and bipolar disorder, mixed. (Tr. at 357).

Claimant first visited Sandeep Saroch, M.D., on January 29, 2008. (Tr. at 387-94). Claimant indicated that she was employed at Tri Data, Inc., and that she was seeking treatment for bipolar disorder and anxiety disorder. (Tr. at 387). Claimant reported that she had abused opiate pain pills and Xanax as recently as that month, but prior to her hospitalization. (*Id.*) Claimant told Dr. Saroch that she was feeling "stressed out." (Tr. at 389). Her depressive symptoms included depressed mood, low energy, anhedonia, decreased concentration, increased sleep, psychomotor retardation, and feelings of worthlessness and hopelessness. (Tr. at 389). Dr. Saroch recorded that these symptoms were moderate, and Claimant indicated that she had experienced them since childhood. (*Id.*) Claimant also reported manic symptoms in the form of euphoric mood, irritable mood, decreased need for sleep, pressured speech, and distractibility. (*Id.*) Dr. Saroch also noted that these symptoms were moderate.

(*Id.*) Claimant also described occasional paranoid thinking and symptoms of anxiety, including agoraphobia, panic attacks, and social phobias. (Tr. at 389-90). Upon mental status examination, Dr. Saroch noted that Claimant appeared clean and tidy and demonstrated fair eye contact. (Tr. at 391). While she was cooperative, her mood and affect were irritable, depressed, and anxious. (*Id.*) Her motor activity appeared agitated. (*Id.*) Claimant's speech was pressured with rapid rate although her prosody was appropriate. (*Id.*) Claimant's thought process was coherent, logical, and circumstantial; however, she demonstrated paranoid thought content. (*Id.*) Dr. Saroch noted no perceptual disturbances. (*Id.*) He also noted that Claimant's immediate, recent, and remote memory were fair, and that she exhibited average fund of knowledge and vocabulary. (*Id.*) Claimant's abstraction and judgment were average while her insight was limited to fair. (*Id.*) Dr. Saroch diagnosed Claimant with bipolar disorder, mixed, severe. (Tr. at 392). In addition, he assigned Claimant a GAF score of fifty.[3] (*Id.*) He advised that she participate in psychotherapy and prescribed her Abilify, Vistaril, Ambien, Lamictal, Trileptal, and Seroquel. (*Id.*)

Claimant treated with Dr. Saroch a number of times throughout 2008. (Tr. at 396-431). On February 28, 2008, Claimant's mood and affect were calm, her thought processes were coherent, her insight was fair, and her judgment was average. (Tr. at 396). Dr. Saroch noted that some of Claimant's symptoms had improved significantly while others were stable. (*Id.*) Claimant's medication regimen remained in place with an increase in Lamictal. (*Id.*) On March 21, 2008, Claimant informed Dr. Saroch that she was "doing very well." (Tr. at 399). Dr. Saroch recorded that Claimant's mood and

---

[3] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM–IV at 34.

affect were calm and appropriate. (*Id.*) Claimant's thought processes were coherent, her insight was fair, and her judgment was average. (*Id.*) Dr. Saroch indicated that Claimant's symptoms were stable and continued her on Abilify 5 mg, Lamictal 100 mg, Ambien 12.5 mg, Trileptal, Seroquel 50 mg, and Vistaril 50 mg. (*Id.*) On May 5, 2008, Claimant reported to Dr. Saroch that she was doing fairly well with no depressive, anxious, or psychotic symptoms. (Tr. at 408). Dr. Saroch noted that Claimant's mood and affect were calm, her thought processes were logical, her insight was fair, and her judgment was average. (*Id.*) Dr. Saroch recorded that Claimant's symptoms were stable and that her prognosis was average. (*Id.*) On June 5, 2008, Claimant reported doing fair with no depressive, psychotic, or anxious symptoms. (Tr. at 412). Dr. Saroch's findings were similar to previous visits, and he noted that Claimant's symptoms were stable. (*Id.*) On July 3, 2008, Claimant's mental status examination was normal, and Dr. Saroch noted that her symptoms were stable. (Tr. at 415). He continued her medication regimen with an increase of Seroquel to 100 mg. (*Id.*) Later that month, on July 30, Claimant reported doing fairly well, and a mental status examination was normal. (Tr. at 418). Dr. Saroch again assessed Claimant's symptoms as stable. (*Id.*) In September 2008, Claimant reported no symptoms of depression, mania, psychosis, or anxiety. (Tr. at 424). A mental status examination raised no concerns, and Dr. Saroch opined that Claimant remained in stable condition. (*Id.*) Claimant's report of symptoms and Dr. Saroch's findings were similar at Claimant's October and December 2008 visits. (Tr. at 427, 431).

Claimant visited Dr. Saroch on a monthly basis in 2009. On January 31, 2009, Dr. Saroch noted Claimant was doing well overall and opined that Claimant's symptoms were stable. (Tr. at 433). On February 27, 2009, Claimant reported

occasional decreased sleep. (Tr. at 434). A mental status examination was unremarkable, and Dr. Saroch increased Claimant's Seroquel dosage. (*Id.*) On March 27, 2009, Dr. Saroch observed that Claimant continued to do well and that her symptoms remained stable. (Tr. at 437). Claimant reported a weight increase at that appointment, and Dr. Saroch advised her to diet and exercise. (*Id.*) On April 24, 2009, Dr. Saroch noted that overall, Claimant was benefiting from her prescribed medication regimen. (Tr. at 440). In May and June 2009, Claimant reported no symptoms of depression, mania, psychosis, or anxiety. (Tr. at 444, 446). Mental status examinations were unremarkable, and Dr. Saroch continued to opine that Claimant's symptoms were stable. (*Id.*) At Claimant's July and August 2009 visits, Dr. Saroch noted that overall, Claimant was doing well. (Tr. at 449, 452). In September and October 2009, Claimant's mental status examinations were unremarkable. (Tr. at 455, 460). The following month, Claimant informed Dr. Saroch the Requip had improved her restless leg symptoms, and a mental status examination was unremarkable. (Tr. at 462). Claimant's symptoms remained stable. (*Id.*) On December 16, 2009, Claimant reported no symptoms of depression, mania, psychosis, or anxiety. (Tr. at 464). A mental status examination was unremarkable, and Dr. Saroch recorded that Claimant's symptoms were stable. (*Id.*)

Claimant continued to treat with Dr. Saroch throughout 2010. On January 12, 2010, she reported a depressed mood, low energy, low concentration and attention, decreased sleep, and psychomotor retardation. (Tr. at 467). Claimant did not indicate experiencing any symptoms of mania, psychosis, or anxiety. (*Id.*) Upon mental status examination, Claimant made fair eye contact and exhibited a cooperative, but reserved attitude. (*Id.*) Dr. Saroch observed that Claimant's affect was calm, depressed, and

withdrawn. (*Id.*) Claimant's mood was noted as sad and calm. (*Id.*) Her speech and thought process were normal while her insight and judgment were fair or average. (*Id.*) Dr. Saroch recorded that Claimant's symptoms were partially stable, and he increased her Seroquel dosage while adding Zoloft. (*Id.*) Claimant returned to Dr. Saroch on February 9, 2010, with no complaints. (Tr. at 470). Her mental status examination was unremarkable, and her condition was deemed stable. (*Id.*) On March 9, 2010, Claimant complained of depressed mood and weight gain. (Tr. at 473). Upon mental status examination, Claimant's mood was calm and sad, and her affect was calm and depressed. (*Id.*) Her motor activity, thought processes, and speech were all normal. (*Id.*) In addition, Claimant demonstrated average judgment and fair insight. (*Id.*) Dr. Saroch recorded that Claimant's symptoms were stable with the caveat that she was experiencing mild "on/off" depressive symptoms. (*Id.*) On April 9, 2010, Claimant reported weight loss, but no other symptoms of depression, mania, psychosis, or anxiety. (Tr. at 476). A mental status examination was unremarkable, and Dr. Saroch assessed Claimant's symptoms as stable. (*Id.*) On May 7, 2010, Claimant reported experiencing depressed mood along with low concentration and attention. (Tr. at 483). Upon mental status examination, Claimant's affect and mood were calm, and her thought process was coherent, logical, and goal directed. (*Id.*) She was assessed as partially stable with "on and off" symptoms. (*Id.*) Dr. Saroch advised her to continue her medication regimen. (*Id.*) In June and July 2010, Claimant reported no complaints, and mental status examinations were unremarkable. (Tr. at 484, 490).

On August 3, 2010, Claimant indicated that she was experiencing depressed mood, weight gain, decreased sleep, irritable mood, and increased goal-directed activity/psychomotor agitation. (Tr. at 495). She informed Dr. Saroch that due to a title

company's mistake, she and her husband were living in a hotel. (*Id.*) Dr. Saroch described Claimant's symptoms as partially stable, noting decreased sleep and mild depressive symptoms. (*Id.*) He increased Claimant's Seroquel dosage. (*Id.*) The following month, Claimant indicated that the increase in Seroquel dosage had helped her, and she reported no symptoms of depression, mania, psychosis, or anxiety. (Tr. at 498). Her mental status examination was normal, and Dr. Saroch opined that Claimant's symptoms were stable. (*Id.*) On October 1, November 1 and November 29, 2010, Claimant remained stable with no change in her treatment plan. (Tr. at 501, 504, 508). On December 28, 2010, Dr. Saroch noted that Claimant was in the process of moving into a new place and was coping well. (Tr. at 511). She did not report any symptoms of depression, mania, psychosis, or anxiety. (*Id.*) Her mental status examination was unremarkable, and Dr. Saroch described Claimant's symptoms as stable. (*Id.*)

Claimant continued to visit Dr. Saroch throughout 2011. On January 27, 2011, Dr. Saroch described Claimant's symptoms as stable and continued her on her medications. (Tr. at 515). In February and March 2011, Claimant reported no symptoms of depression, mania, psychosis, or anxiety. (Tr. at 519, 521). Claimant's mental status examinations were unremarkable, and Dr. Saroch continued to assess Claimant's symptoms as stable. (*Id.*) On April 27, 2011, Claimant was accompanied by her husband who reported that Claimant had gambled away over $80,000 of their savings without his knowledge. (Tr. at 524). Claimant's husband further indicated that Claimant had last gambled in June 2010 and that he was upset that Claimant had lied about her gambling. (*Id.*) Claimant complained of a depressed mood, low energy, weight gain, psychomotor retardation, racing thoughts, irritable mood, increased goal-

directed activity/psychomotor agitation, and mood instability. (*Id.*) Upon mental status examination, Claimant exhibited a calm, but sad mood with depressed affect. (*Id.*) Her eye contact was fair, and her attitude was cooperative. (*Id.*) Dr. Saroch noted that Claimant's thought processes, speech, and motor activity were normal. (*Id.*) Claimant's insight was fair, and her judgment was average. (*Id.*) Dr. Saroch assessed Claimant as previously stable with recent increased mood symptoms. (*Id.*) Dr. Saroch increased Claimant's Lamictal dosage. (*Id.*)

On May 23, 2011, Claimant had no complaints other than weight gain. (Tr. at 526). Claimant informed Dr. Saroch that her husband had lost his job. (*Id.*) A mental status examination was normal, and Dr. Saroch assessed Claimant's symptoms as stable. (*Id.*) Dr. Saroch decreased Claimant's Lamictal dosage. (*Id.*) The following month, Claimant's symptoms remained stable, and she was continued on her medications. (Tr. at 529). In July 2011, Claimant reported experiencing depressed mood, weight loss, and psychomotor retardation. (Tr. at 537). Claimant's mental status examination was essentially unremarkable, including a calm mood and affect with fair insight and average judgment. (*Id.*) Dr. Saroch opined that Claimant's symptoms were partially stable, with some intermittent depression, and he continued her medication regimen. (*Id.*) In August 2011, Claimant continued to describe symptoms of depressed mood and psychomotor retardation. (Tr. at 567). Dr. Saroch recorded that Claimant was doing fair overall. (*Id.*) He observed that Claimant's affect was calm, but flat. (*Id.*) Her mental status examination was otherwise normal. (*Id.*) Dr. Saroch assessed Claimant as partially stable with intermittent "down" days. (*Id.*) A toxicology screen performed that day was negative for the presence of alcohol, opiates, barbiturates, benzodiazepines, and amphetamines. (Tr. at 568-69).

On September 18, 2011, Claimant indicated a depressed mood, low concentration and attention, and psychomotor retardation; however, Dr. Saroch reported that Claimant was doing fair overall. (Tr. at 572). Claimant's mental status examination was unremarkable, and Dr. Saroch again assessed Claimant's symptoms as stable. (*Id.*) In October 2011, Claimant reported experiencing depressed mood and decreased sleep. (Tr. at 584). Claimant was assessed as stable with decreased sleep, and she was started on Ativan and discontinued from Ambien. (*Id.*) The next month, Claimant complained of weight gain. (Tr. at 586). A mental status examination was unremarkable, and Dr. Saroch discussed diet and exercise with Claimant. (*Id.*) Claimant was assessed as stable and continued on her medications. (*Id.*) On December 1, 2011, Claimant reported depressed mood, weight loss, low energy, low concentration and attention, and psychomotor retardation. (Tr. at 588). Upon mental status examination, Claimant's mood was calm and her affect was calm, appropriate, and within normal range. (*Id.*) Dr. Saroch recorded that Claimant was cooperative exhibiting average judgment and fair insight. (*Id.*) He assessed Claimant as partly stable with "on/off" symptoms and continued Claimant on her medication regimen. (*Id.*)

Claimant continued her treatment with Dr. Saroch in 2012. At her January 2012 appointment, Claimant reported depressed mood, low concentration and attention, decreased sleep, psychomotor retardation, psychomotor agitation, and intermittent anxiety. (Tr. at 594). Claimant's appearance was appropriate and her attitude was cooperative. (*Id.*) Upon mental status examination, Dr. Saroch observed that Claimant's motor activity, thought processes, and speech were normal. (*Id.*) Claimant's mood was preoccupied, and her affect was preoccupied and constricted. (*Id.*) Dr.

Saroch recorded that Claimant's insight was fair and her judgment was average. (*Id.*) He noted that Claimant experienced intermittent depression, and Claimant's diagnosis of bipolar disorder, mixed, severe, remained unchanged. (*Id.*) Claimant informed Dr. Saroch that she did not want to change her medications, and she was continued on her existing regimen. (*Id.*)

On February 16, 2012, Claimant reported occasional depressed mood, weight gain, psychomotor retardation, psychomotor agitation, and intermittent anxiety. (Tr. at 596). Upon mental status examination, Dr. Saroch noted that Claimant's mood and affect were preoccupied; otherwise, the examination was unremarkable. (*Id.*) Dr. Saroch described Claimant as sad, but coping, and continued her medication regimen. (*Id.*) In March 2012, Claimant indicated that she had experienced depressed mood, weight loss, low concentration and attention, psychomotor retardation, and intermittent anxiety. (Tr. at 599). Her mental status examination was the same as the previous visit, and Dr. Saroch described Claimant as suffering from intermittent depression. (*Id.*) He decreased her Trileptal dosage and instructed her to discontinue using Requip. (*Id.*) Dr. Saroch indicated that Claimant's prognosis was average. (*Id.*) The following month, Claimant reported the same symptoms and informed Dr. Saroch that she could not discontinue Requip. (Tr. at 600). Upon mental status examination, Claimant's mood was dull and her affect was flat. (*Id.*) Her examination was otherwise unremarkable. (*Id.*)

In May 2012, Claimant described experiencing depressed mood, weight gain, low energy, low concentration and attention, anhedonia, decreased sleep, and psychomotor retardation. (Tr. at 604). Upon mental status examination, Dr. Saroch recorded that Claimant's mood and affect were anxious, and her motor activity was

fidgety. (*Id.*) Dr. Saroch noted that Claimant's prognosis was guarded, and continued her on medication. (*Id.*) On June 27, 2012, Dr. Saroch noted Claimant's causal anxiety continued and that she continued to experience intermittent symptoms of depression. (Tr. at 606). Dr. Saroch recorded that Claimant's mood was calm and dull while her affect was calm and flat, but her mental status examination was otherwise unremarkable. (*Id.*) Her diagnosis remained the same, and Dr. Saroch upgraded her prognosis to average. (*Id.*) In July 2012, Claimant reported similar symptoms of depression and anxiety. (Tr. at 615). Dr. Saroch noted that Claimant's mood and affect were depressed, anxious, and preoccupied. (*Id.*) Claimant was continued on her medication regimen at that time as she did not want to change her medications. (*Id.*) The following month, Claimant reported depressed mood, weight loss, low concentration and attention, low energy, psychomotor retardation, and euphoric mood. (Tr. at 613). She also indicated that she had been gambling online even though she was experiencing financial difficulties. (*Id.*) Dr. Saroch recorded that Claimant's mood was dull and her affect was flat, but her mental status examination was otherwise unremarkable. (*Id.*) Claimant's prognosis remained average. (*Id.*) In September 2012, Claimant described many of the same symptoms as well as experiencing racing thoughts and flight of ideas. (Tr. at 611). Upon mental status examination, Dr. Saroch noted that Claimant's mood was dull and preoccupied while her affect was preoccupied and flat. (*Id.*) The remainder of the examination was normal, and Dr. Saroch continued Claimant on her medications. (*Id.*)

In October 2012, Claimant indicated that she suffered from depressed mood, low concentration and attention, anhedonia, psychomotor retardation, irritable mood, racing thoughts, and flight of ideas. (Tr. at 608). She also expressed feeling anxious

about the future of her relationship. (*Id.*) Dr. Saroch noted that Claimant's mood and affect were preoccupied, but her mental status examination was otherwise unremarkable. (*Id.*) Dr. Saroch again described Claimant's prognosis as average and continued her on the same medication regimen. (*Id.*) On November 20, 2012, Claimant continued to report a depressed mood, low energy, low concentration and attention, anhedonia, decreased sleep, psychomotor retardation, irritable mood, racing thoughts, flight of ideas, and intermittent anxiety.[4] (Tr. at 637). Dr. Saroch observed that Claimant's mood was preoccupied, and her affect was constricted and preoccupied; otherwise, Claimant's mental status examination was normal. (*Id.*) Dr. Saroch noted that Claimant's symptoms were intermittent, and he again assessed Claimant's prognosis as average. (*Id.*) Claimant remained on her medication regimen. (*Id.*) On December 20, 2012, Claimant described experiencing depressed mood, significant appetite or weight change, low energy, low concentration and attention, anhedonia, decreased sleep, feelings of worthlessness and hopelessness, irritable mood, racing thoughts, flight of ideas, distractibility, psychomotor agitation, and mood instability. (Tr. at 640). Upon mental status examination, Dr. Saroch noted that Claimant's appearance was appropriate, her eye contact was fair, and her attitude was cooperative. (*Id.*) He further indicated that Claimant's mood was sad and preoccupied while her affect was depressed and constricted. (*Id.*) Claimant's insight, judgment, thought processes, speech, and motor activity were all normal. (*Id.*) Claimant maintained a diagnosis of bipolar disorder, mixed, severe, and Dr. Saroch described Claimant's symptoms as intermittent. (*Id.*) Claimant's prognosis and medication

---

[4] Dr. Saroch's treatment notes from November and December 2012 were incorporated into the administrative record by the Appeals Council. (Tr. at 5).

regimen remained unchanged. (*Id.*)

**B. Evaluations and Opinions**

On August 12, 2011, G. David Allen, Ph.D., prepared a Case Analysis wherein he requested a routine mental abstract from a psychiatrist. (Tr. at 541). Dr. Allen noted that although Claimant's mental status examinations seemed normal, there was a report of Claimant gambling and losing a significant amount of money. (*Id.*) Dr. Allen indicated that a psychiatric report as to Claimant's relevant functional criteria, along with a third party adult function report from Claimant's husband, would aid in analyzing Claimant's case. (*Id.*)

On September 7, 2011, Dr. Allen completed a Mental RFC Assessment. (Tr. at 542-44). On the subject of Claimant's memory and understanding, Dr. Allen opined that Claimant was not significantly limited in her abilities to remember locations and work-like procedures or understand and remember very short and simple instructions. (Tr. at 542). She was found to be moderately limited in her ability to understand and remember detailed instructions. (*Id.*) With respect to sustained concentration and persistence, Dr. Allen concluded that Claimant was not significantly limited in her abilities to carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with, or proximity to, others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms; and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 542-43). Dr. Allen determined that Claimant was moderately limited in her abilities to carry out detailed instructions

and maintain attention and concentration for extended periods. (Tr. at 542). As for Claimant's ability to interact socially, Dr. Allen found that Claimant was not significantly limited in her abilities to ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavior extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. at 543). However, Dr. Allen determined that Claimant was moderately limited in her ability to interact appropriately with the general public. (*Id.*) As for Claimant's ability to adapt, Dr. Allen opined that Claimant was not significantly limited in her abilities to respond appropriately to changes in the work setting, be aware of normal hazards and take appropriate precautions, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others. (*Id.*)

In his functional capacity assessment, Dr. Allen concluded that Claimant's statements were credible given her continued treatment for bipolar disorder. (Tr. at 544). Dr. Allen noted that Claimant's husband reported making lists for Claimant to follow and that she was able to follow those lists. (*Id.*) Because Claimant had demonstrated a tendency to be impulsive, particularly with spending and gambling, Dr. Allen indicated that she would not do well in work requiring the handling of money. (*Id.*) However, he did find that Claimant had sufficient residual functional capacity to perform simple, routine, and repetitive tasks. (*Id.*) Dr. Allen further concluded that Claimant should perform solitary work given her tendency to avoid others. (*Id.*)

That same day, Dr. Allen completed a Psychiatric Review Technique. (Tr. at

546-59). Dr. Allen recorded that Claimant suffered an affective disorder in the form of "bipolar, mixed." (Tr. at 549). In assessing the paragraph B criteria of Listing 12.04, Dr. Allen opined that Claimant had mild limitation in activities of daily living and maintaining concentration, persistence, or pace. (Tr. at 556). He further opined that Claimant possessed moderate limitation in maintaining social functioning. (*Id.*) Dr. Allen noted that Claimant had no episodes of decompensation of extended duration. (*Id.*) Dr. Allen also determined that Claimant did not meet the paragraph "C" criteria for Listing 12.04. (Tr. at 557). In the "Consultant's Notes" section of the form, Dr. Allen recorded that Claimant reported experiencing problems handling stress and suffering from "many fears." (Tr. at 558). In support of his opinions, Dr. Allen cited his own RFC assessment and the results of a June 2011 mental status examination performed by Dr. Saroch. (*Id.*)

On October 22, 2011, Jeff Harlow, Ph.D., completed a Case Analysis. (Tr. at 573). Dr. Harlow noted that Claimant had not reported a change in her condition or any new mental illnesses or limitations. (*Id.*) He acknowledged the existence of a September 18, 2011, mental health treatment record postdating the initial assessment of Claimant's file; notwithstanding, he concluded that Dr. Allen's Mental RFC Assessment and Psychiatric Review Technique continued to accurately reflect Claimant's ability to perform work. (*Id.*) Thus, Dr. Harlow affirmed Dr. Allen's Mental RFC Assessment and Psychiatric Review Technique. (*Id.*)

On October 23, 2012, Dr. Saroch completed a Mental Capacities Assessment. (Tr. at 618-20). Dr. Saroch was asked to rate Claimant's ability to perform work-related activities on a day-to-day basis using a scale that ranged from no ability to "good" ability, with "poor" and "fair" ability in between. (Tr. at 618). "Poor" ability

meant that ability to function was "seriously limited, but not precluded"; "fair" ability meant that ability to function was "limited but satisfactory"; and "good" ability meant that ability to function in this area was "not limited by mental impairment." (*Id.*) Dr. Saroch found that in the category of making occupational adjustments, Claimant had poor ability to follow work rules, relate to co-workers, deal with the public, interact with supervisors, deal with work stress, function independently, maintain attention and concentration, and persist at a work-like task. (*Id.*) In addition, Dr. Saroch concluded that Claimant retained fair ability to use judgment. (Tr. at 618). In support of his opinions in this area, Dr. Saroch cited Claimant's reported low concentration, low attention, low energy, depressed mood, irritability, anxiety, and paranoia. (*Id.*) In the area of making performance adjustments, Dr. Saroch opined that Claimant had poor ability to understand, remember, and carry out complex, detailed, and simple job instructions. (Tr. at 619). In support of this opinion, Dr. Saroch cited Claimant's reported poor focus, disorganized thoughts, low concentration/attention, racing thoughts, and distractibility. (*Id.*) With regard to personal-social adjustments, Dr. Saroch determined that Claimant retained fair ability to maintain personal appearance; however, she had poor ability to behave in an emotionally stable manner, relate predictably in social situations, and demonstrate reliability. (*Id.*) Dr. Saroch supported these specific opinions by referencing Claimant's reported irritability, distractibility, mood instability, and panic attacks while alone and in crowds. (*Id.*) In addition to providing specific functional opinions, Dr. Saroch also wrote:

> Patient has been diagnosed with Bipolar Disorder, most recent episode, mixed severe, Social Anxiety and Panic Disorder. Symptoms include but are not limited to: depressed mood, low energy, low concentration and attention, anhedonia, psychomotor retardation, feelings of worthlessness/hopelessness, euphoric mood, irritability, racing thoughts,

> distractibility, pressured speech, psychomotor agitation, paranoid thinking, thought disorganization, suicidal thoughts (in past), anxiety attacks alone and in crowds, anticipatory anxiety and phobic avoidance. Patient experiences poor memory, forgetfulness, inability to persist at tasks, lack of frustration tolerance and inability to handle stressful situations. She also has a high harm avoidance and low persistence along with poor self directiveness and self transcendence, all of which are likely to affect future jobs.

(Tr. at 620). Dr. Saroch opined that Claimant could manage any benefits in her own best interest. (*Id.*)

## VI. <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson*, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable Regulations and Rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII. Discussion

### A. The ALJ's Consideration of Dr. Saroch's Opinions

Claimant contends that the ALJ violated the "treating physician rule" by "disregarding/downgrading" Dr. Saroch's opinions as to Claimant's mental RFC. (ECF No. 14 at 8). She insists that Dr. Saroch's use of the term "poor" on the Mental Capacities Assessment form is synonymous with the term "'marked' as used in the applicable rules and regulations." (*Id.* at 6). Claimant avers that the ALJ failed to cite any evidence in support of his finding that Claimant did not possess "marked" limitations in the functional areas assessed as "poor" by Dr. Saroch. (*Id.* at 8-9).

When evaluating a claimant's application for disability benefits, the ALJ "will always consider the medical opinions in [the] case record together with the rest of the relevant evidence [he] receives." 20 C.F.R. § 404.1527(b). Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources will be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given ***controlling*** weight when the opinion is supported by clinical and laboratory

diagnostic techniques and is not inconsistent with other substantial evidence. *Id*. If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[5] listed in 20 C.F.R. § 404.1527(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[6] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected ... In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

---

[5] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[6] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulation does not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulation mandates only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). This Court has held that "while the ALJ also has a duty to 'consider' each of the ... factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the ... factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin*, No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

Medical source statements on issues reserved to the Commissioner, however, are treated differently than other medical source opinions. SSR 96-5p, 1996 WL 374183 (S.S.A. 1996). In both the Regulations and SSR 96-5p, the SSA explains that "some issues are not medical issues regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability;" including the following:

> 1. Whether an individual's impairment(s) meets or is equivalent in severity to the requirements of any impairment(s) in the listings;
>
> 2. What an individual's RFC is;
>
> 3. Whether an individual's RFC prevents him or her from doing past relevant work;
>
> 4. How the vocational factors of age, education, and work experience apply; and
>
> 5. Whether an individual is "disabled" under the Act.

*Id*. at *2. "The regulations provide that the final responsibility for deciding issues such as these is reserved to the Commissioner." *Id.* As such, a medical source statement on an issue reserved to the Commissioner is never entitled to controlling weight or special significance, because "giving controlling weight to such opinions would, in effect, confer upon the [medical] source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine when an individual is disabled." *Id*. at *2. Still, these opinions must always be carefully considered, "must never be ignored," and should be assessed for their supportability and consistency with the record as a whole. *Id*. at *3.

After summarizing Claimant's treatment records and the opinion evidence

provided by Dr. Allen and Dr. Harlow, the ALJ assigned "great weight" to Dr. Saroch's opinion as to Claimant's functional limitations. (Tr. at 128-33). The ALJ recognized that Claimant had a long treatment relationship with Dr. Saroch for her bipolar disorder. (Tr. at 133). In discussing Dr. Saroch's opinion, the ALJ noted that the Dr. Saroch had rated Claimant's ability to function as "poor" in a number of areas and that the Mental Capacities Assessment form defined the term "poor" as "seriously limited, but not precluded." (*Id.*) The ALJ asserted that he used the functional limitations set forth by Dr. Saroch in determining Claimant's RFC, and overall, the ALJ described Dr. Saroch's opinion as supportive of "moderate limitations." (*Id.*) Furthermore, the ALJ acknowledged that Claimant had characterized the term "poor" as having the same meaning as "marked" at the administrative hearing, but the ALJ found that "marked limitations are not consistent with the records or the findings of the other mental opinions."[7] (*Id.*)

As Claimant recognizes, whether the ALJ appropriately incorporated Dr. Saroch's opinion into the RFC finding entirely depends on the meaning of the term "poor" as used by Dr. Saroch. (ECF No. 14 at 6). Dr. Saroch never stated that his use of the term "poor" was interchangeable with the term "marked" as used in the disability context. *See, e.g.*, *McClanahan v. Colvin*, No. 3:14-11819, 2015 WL 1235236, at *19 (S.D.W.Va. Mar. 17, 2015) (stating that two terms were not synonymous at step three of sequential process and citing cases); *cf. Wright v. Astrue*, No. 8:11-cv-2439-TLW-JDA, 2012 WL 6947788, at *14 (D.S.C. Dec. 11, 2012) (stating that "poor" or seriously limited, but not precluded ability to maintain concentration and attention was

[7] The undersigned presumes that the ALJ was referencing the term "marked" as used in Listing 12.00(C).

supportive of only moderate limitations in concentration), *report and recommendation adopted by* 2013 WL 314757 (D.S.C. Jan 28, 2013). Moreover, Dr. Saroch never opined that Claimant had "marked" limitations in any functional areas; instead, Claimant's counsel characterized Dr. Saroch's opinion in that light at the administrative hearing. (Tr. at 168-69). The ALJ properly rejected this attempt to rewrite Dr. Saroch's opinion in different terms and appreciated that Dr. Saroch had only opined that Claimant was seriously limited, but not precluded in certain functional areas.

In crafting Claimant's RFC, the ALJ realized that Dr. Saroch meant what he wrote—Claimant was seriously limited in certain functional areas, *but **not precluded** from functioning in those areas*. *See McPherson v. Astrue*, 605 F. Supp. 2d 744, 758 (S.D.W.Va. 2009) (stating "poor" rating, which was defined as seriously limited, but not precluded in that area, "does not mean that [p]laintiff does not have these abilities; it simply means that they are limited."). Otherwise, Dr. Saroch could have rated Claimant's ability as none, which would have signaled that Claimant could not function in that area. Ultimately, the ALJ took Dr. Saroch's opinion into account when ascribing mental functional limitations to Claimant. For example, the ALJ acknowledged Dr. Saroch's opinion that Claimant retained "poor" ability to relate predictably in social situations and to interact with the public, co-workers, and supervisors by limiting Claimant to occasional contact with the public and co-workers. (Tr. at 128, 132); *see Patsios v. Colvin*, No. 4:13-cv-3134, 2015 WL 926126, at *10 (D. Neb. Mar. 4, 2015) (stating that ALJ's finding that claimant could occasionally interact with public conformed with nurse practitioner's opinion that claimant was seriously limited, but not precluded from interacting with public). Another example—the ALJ took into

account Claimant's "poor" ability to handle work stress by restricting her from work that required "fast paced production requirements," and finding that she could perform only simple, routine, and repetitive tasks. (Tr. at 128, 132); *see White v. Colvin*, No. 12-1436, 2014 WL 768700, at *3 (W.D. Pa. Feb. 25, 2014) (finding that ALJ fully accounted for claimant's "poor" ability to handle work stress by limiting claimant to low stress work); *Olatubosun v. Astrue*, No. 8:09CV376, 2010 WL 3724819, at *11 (D. Neb. Sept. 17, 2010) (rejecting argument that "poor" ability to handle work stress precluded work altogether and finding that RFC properly accounted for "poor" ability to handle work stress where claimant was limited to simple work with limited interactions with others). Limiting Claimant to simple, routine, and repetitive tasks also accounted for her "poor" ability to maintain attention and concentration. (Tr. at 128, 132); *McPherson*, 605 F. Supp. 2d at 758. While Dr. Saroch opined that Claimant possessed "poor" ability to understand, remember, and carry out simple job instructions, which may seemingly conflict with the ALJ's RFC finding that Claimant could perform simple, routine, and repetitive tasks, again Claimant was not *precluded* from exercising an ability in that area. (Tr. at 128, 132); *see Alston v. Astrue*, No. 2:09CV00078, 2010 WL 3734718, at *3 (W.D. Va. Sept. 21, 2010) (recognizing that serious limitation in performing simple tasks did not prevent performing those tasks). In addition, the ALJ considered Claimant's "poor" ability to function independently and follow work rules by limiting her to work requiring only occasional use of judgment (an area in which Dr. Saroch found Claimant retained "fair" ability) and "only simple, work-related decisions." (Tr. at 128, 132).

To the extent that Claimant argues that more severe mental limitations should have been included in the ALJ's RFC finding as a result of Dr. Saroch's opinion, the

ALJ appropriately found that the medical record as a whole and the other opinion evidence did not support additional limitations. (Tr. at 133). Although the ALJ did not explicitly cite those medical records that were inconsistent with assigning more signification mental limitations, it is clear from the ALJ's written decision that he was referencing the mental health treatment records that he summarized throughout the decision. The ALJ noted that Claimant informed Dr. Saroch she was doing very well after being placed on medication in March 2008. (Tr. at 130, 399). The ALJ further recognized that throughout 2008 and 2009, Claimant continued to do well under Dr. Saroch's care and that Dr. Saroch described Claimant's condition as stable throughout that period. (Tr. at 130-31, 408, 412, 415, 418, 424, 427, 431, 433, 437, 440, 444, 446, 462, 464). After reporting some increased symptoms in January 2010, Claimant was again described as stable and reported no complaints in February 2010 after an adjustment to her medication regimen. (Tr. at 131, 467, 470). While Claimant sometimes reported increased symptoms of depression in 2010, Dr. Saroch often opined that Claimant's condition was stable; this was particularly true after her Seroquel dosage was increased in August 2010, and Claimant reported no increased symptoms for the rest of that year. (Tr. at 131, 473, 476, 483-84, 490, 495, 498, 501, 504, 508, 511). During the first three months of 2011, Claimant continued to report no increased symptoms and Dr. Saroch continued to assess Claimant's condition as stable. (Tr. at 515, 519, 521). In April 2011, Claimant informed Dr. Saroch about her gambling problem and reported increase symptoms; however, the following month, Claimant reported no symptoms of depression, mania, or anxiety, and a mental status examination was normal. (Tr. at 524, 526). Dr. Saroch again opined at that time that Claimant's symptoms were stable. (Tr. at 131). In July 2011, Claimant reported

experiencing increased symptoms of depression, but a mental status examination was essentially unremarkable. (Tr. at 537). Dr. Saroch opined that Claimant's symptoms were partially stable, with some intermittent depression, and he continued her medication regimen. (*Id.*) In August 2011, Dr. Saroch recorded that Claimant was doing fair overall. (Tr. at 567). In September 2011, Claimant described a depressed mood, low concentration and attention, and psychomotor retardation; however, Dr. Saroch reported that Claimant was doing fair overall and Claimant's mental status examination was unremarkable. (Tr. at 131, 572). In October 2011, Dr. Saroch opined that Claimant was stable with decreased sleep, and she was started on Ativan. (Tr. at 131, 584). In December 2011, Claimant reported additional symptoms of depression, but a mental status examination was normal. (Tr. at 588). Dr. Saroch recorded that Claimant was partly stable with "on/off" symptoms and continued Claimant on her medication regimen. (*Id.*) In January 2012, Claimant reported symptoms of depression, and Dr. Saroch noted that these symptoms were intermittent. (Tr. at 594). Claimant indicated at that appointment that she did not want her medication regimen changed, and Dr. Saroch agreed. (*Id.*) Throughout 2012, Claimant informed Dr. Saroch that she was experiencing various symptoms of depression, mania, and anxiety. Still, her mental status examinations were typically unremarkable, other than a preoccupied, anxious, or occasionally depressed mood and affect.[8] (Tr. at 596, 599, 604, 606, 608, 513, 611, 615). Dr. Saroch described Claimant's symptoms as intermittent a number of times that year, and Claimant's prognosis remained average throughout 2012, with the exception of one occasion on which Dr. Saroch downgraded

[8] While the ALJ did not discuss each of Dr. Saroch's treatment records from 2012, he clearly considered them. (Tr. at 129, 131).

her prognosis to guarded. (*Id.*)

Overall, Dr. Saroch's treatment records demonstrate that Claimant's condition was primarily stable or improving from 2008 through 2011. At times during that three-year span, Claimant reported some increase symptoms of depression, but medication changes consistently alleviated those symptoms. While Claimant regularly reported varying degrees of depression, mania, and anxiety throughout 2012, she twice indicated that she did not want to change her medication regimen. (Tr. at 594, 615). Dr. Saroch apparently found no urgent reason to change her medication regimen despite her reported symptoms. In addition, Claimant's mental status examinations were steadily unalarming during that time, and her prognosis remained unchanged. Accordingly, Dr. Saroch's treatment notes do not support a finding of more severe mental functional limitations.

Furthermore, the ALJ correctly pointed out that the other opinion evidence provided by Dr. Allen and Dr. Harlow belied any assertion of "marked" limitations in those functional areas that Dr. Saroch rated as "poor."[9] (Tr. at 132). Dr. Allen's Mental RFC Assessment found, *at most*, moderate limitations in the areas of understanding and memory, sustained concentration and persistence, and social interaction. (Tr. at 542-43). In his Psychiatric Review Technique, Dr. Allen opined that Claimant had mild limitation in activities of daily living and maintaining concentration, persistence, or pace, and moderate limitation in maintaining social functioning. (Tr. at 556). After reviewing the record as it existed in October 2011, Dr. Harlow affirmed Dr. Allen's opinions. (Tr. at 573).

---

[9] Agency consultants, like Dr. Allen and Dr. Harlow, "are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the Act." SSR 96-6P, 1996 WL 374180, at *3 (S.S.A. 1996).

Finally, the ALJ also considered Claimant's ability to work in 2010 as a telemarketer for a little over one month. (Tr. at 132). Claimant indicated that her telemarketing job required her to sit at a computer and talk on the telephone for twelve hours each day, four days per week. (Tr. at 132, 243, 281). She testified that she left employment there because she could not stay focused on her job after one or two hours. (Tr. at 147). While the ALJ did not find that this work constituted substantial gainful activity, he did note that Claimant's telemarketing work demonstrated that she "was capable of performing work activity after her alleged onset date." (Tr. at 132). The ALJ appropriately considered this evidence in determining Claimant's RFC. *See* 20 C.F.R. § 404.1571 ("The work, without regard to legality, that you have done during any period in which you believe you are disabled may show that you are able to work at the substantial gainful activity level. ... Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.").

In sum, after assigning "great weight" to Dr. Saroch's opinion, the ALJ appropriately incorporated that opinion into his RFC finding. The undersigned **FINDS** that the ALJ properly considered Dr. Saroch's opinion and that the ALJ's RFC finding is supported by substantial evidence. Furthermore, the undersigned **FINDS** that substantial evidence supports the ALJ's conclusion that additional mental functional limitations were not supported by the record.[10]

**B. Listing 12.04**

As set forth above, Claimant asserts that her reported limitations and Dr. Saroch's opinions, if interpreted correctly and assigned appropriate weight, support a

[10] Because more severe mental functional limitations were not supported by the record, the ALJ properly declined to adopt the hypothetical presented by Claimant's attorney at the administrative hearing. *See Russell v. Barnhart*, 58 F. App'x 25, 30 (4th Cir. 2003) (noting that hypothetical question "need only reflect those impairments supported by the record").

finding that Claimant meets Listing 12.04. (ECF No. 14 at 9-12). Specifically, Claimant insists that she suffered from "marked" limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (*Id.* at 10-12). Because the undersigned finds that the ALJ properly interpreted Dr. Saroch's opinion, much of Claimant's foundation for this argument dissipates. Notwithstanding, the undersigned addresses Claimant's specific contention as to Listing 12.04.

A determination of disability may be made at step three of the sequential evaluation when a claimant's impairments meet or medically equal an impairment included in the Listing. 20 C.F.R. § 404.1520(a)(4)(iii). The purpose of the Listing is to describe "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *Id.* § 404.1525. Because the Listing is designed to identify those individuals whose medical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA has intentionally set the medical criteria defining the listed impairments at a higher level of severity than that required to meet the statutory standard of disability. *Sullivan v. Zebley*, 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). Given that the Listing bestows an irrefutable presumption of disability, "[f]or a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria." *Id.* at 530.

In order to meet or medically equal Listing 12.04, Claimant must first establish that she fulfills the criteria set forth in paragraph A of the disorder, often referred to as the diagnostic description. As explained in the Listing, "[t]he criteria in paragraph A substantiate medically the presence of a particular mental disorder. Specific

symptoms, signs, and laboratory findings in the paragraph A criteria of any of the listings in this section cannot be considered in isolation from the description of the mental disorder contained at the beginning of each listing category. Impairments should be analyzed or reviewed under the mental category(ies) indicated by the medical findings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(A). Assuming that Claimant meets the paragraph A criteria for Listing 12.04,[11] she must also meet or equal the severity criteria contained in paragraph B or paragraph C of the listed impairment in order to be presumptively disabled. *Id.* ("The criteria in paragraphs B and C describe impairment-related functional limitations that are incompatible with the ability to do any gainful activity. The functional limitations in paragraphs B and C must be the result of the mental disorder described in the diagnostic description, that is manifested by the medical findings in paragraph A"). Under Listing 12.04, Claimant must show that her affective disorder:

> B. [Resulted] in at least two of the following:
>
> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration;
>
> **OR**
>
> C. [She had a m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

[11] The Commissioner does not dispute that Claimant meets the paragraph A criteria. (ECF No. 15 at 9).

> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.04. In relation to Listing 12.04, marked "means more than moderate but less than extreme." *Id.* ¶ 12.00(C). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." *Id.*

In discussing the paragraph B criteria of Listing 12.04, the ALJ found that Claimant had mild restriction in activities of daily living and maintaining concentration, persistence, or pace, and moderate restriction with regard to social functioning. (Tr. at 126-27). Beginning with activities of daily living, the ALJ noted that Claimant reported that she was able to perform any physical activity so long as a list was made for her by her husband reminding her to perform the activity. (Tr. at 126). The ALJ noted that Claimant attended church regularly and shopped weekly for groceries. (*Id.*) Claimant testified at the administrative hearing that she watched television, cleaned the house, cooked, and did laundry, but that those activities took longer due to her lack of ability to focus. (Tr. at 127). In addition, the ALJ recognized that Claimant's husband reported that she attended youth sporting events, watched television or movies, and played computer games. (Tr. at 126-27). As to social functioning, the ALJ observed that Claimant reported she was able to go out alone,

attend church, shop at a large retail store each week, and keep in contact with persons through text messaging. (Tr. at 127). The ALJ also acknowledged that Claimant indicated she had never been fired or laid off from a job as a result of problems getting along with others. (*Id.*) Finally, as to concentration, persistence, and pace, the ALJ again emphasized Claimant's ability to perform all physical activities so long as a list was made for her by her husband. (*Id.*) The ALJ remarked that Claimant was able to drive a car, use public transportation, text message, attend church, shop weekly, follow written instructions well, and shop using the computer. (*Id.*) Given these findings, the ALJ concluded that Claimant did not meet the paragraph B criteria of Listing 12.04.[12] (*Id.*) The ALJ also determined that the evidence failed to establish the presence of the paragraph C criteria. (*Id.*)

Claimant argues that the ALJ erred in not finding "marked" limitations in paragraph B's three functional areas (though only two "marked" limitations would suffice to meet Listing 12.04). Claimant's position largely relies on her interpretation of Dr. Saroch's opinion, and her equating Dr. Saroch's use of the term "poor" with the use of the term "marked" in Listing 12.04. In addressing an identically defined term of "poor" at step three of the sequential evaluation process, this Court has found that "poor" is not synonymous with the term "marked" as used in Listing 12.04. *McClanahan*, 2015 WL 1235236, at *19. Other federal courts agree that a term like "poor," as defined here, is "both a measure of ability and disability." *Cantrell v. Apfel*, 231 F.3d 1104, 1107 (8th Cir. 2000); *see also Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 993–94 (6th Cir. 2007); *McClanahan*, 2015 WL 1235236, at *19 (citing

[12] The ALJ also found that Claimant had not experienced any episodes of decompensation of extended duration. (Tr. at 127).

additional cases). *But see Cruse v. United States Dep't of Health & Human Servs.*, 49 F.3d 614, 618 (10th Cir. 1995) (concluding that "seriously limited, but not precluded," is "essentially" same as "marked"), *superseded on other grounds by regulation as stated in Carpenter v. Astrue*, 537 F.3d 1264, 1268 (10th Cir. 2008).[13] As the Sixth Circuit explained in *Colvin v. Barnhart*, "[t]he plain meaning of 'seriously limited but not precluded' is that one is not precluded from performing in that area. It defies logic to assert that a finding of 'not precluded' actually means that one is precluded." 475 F.3d 727, 731 (6th Cir. 2007).[14] Given this Court's statement in *McClanahan* that the use of "poor," or "seriously limited, but not precluded," on a mental assessment form does not equate to Listing 12.04's use of the term "marked," the undersigned **FINDS** that Claimant's argument to the contrary is unconvincing.

Furthermore, the ALJ cited substantial evidence in his analysis of the paragraph B criteria. With regard to activities of daily living, Listing 12.00(C)(1) states that an ALJ should consider activities like "cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(1). Listing 12.00(C)(1) goes on to state that "marked" limitation in this functional area is not defined "by a specific number of different activities of daily living in which functioning is impaired, but by the nature

---

[13] In *Murray v. Colvin*, No. C-13-01182, 2014 WL 1396408, at *7 (N.D. Cal. Apr. 10, 2014), the court recognized that "*Cruse's* definition, equating 'seriously limited but not precluded' to a 'marked' limitation has been widely criticized." *See also Esquivel v. Astrue*, No. 08-cv-01381-JLT, 2010 WL 367548, at *7 (E.D. Cal. Jan. 26, 2010) (recognizing same).

[14] In *Sullenger*, the Sixth Circuit went so far as to state that mental functional capacity assessments, like Dr. Saroch's in this case, are considered at step five of the sequential evaluation process, and thus, the definition of "marked" from the Listing, which is considered at step three, **cannot** be utilized at step five when considering a treating physician's mental functional capacity assessment. 255 F. App'x at 993-94. As explicated above, the formulation of a claimant's RFC occurs after step three, but the RFC finding is used at both steps four and five.

and overall degree of interference with function." *Id.* "For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without undue interruptions or distractions." *Id.* The ALJ stressed that Claimant was capable of performing virtually unlimited activities of daily living so long as she was given a list setting out activities that she was required to perform. (Tr. at 126). The ALJ further noted that Claimant was able to shop, occasionally cook, clean, use public transportation, do laundry, and use a telephone. (Tr. at 126-27). Although Claimant reported that her husband supervises her while she performs her daily tasks, she also reported that he is employed and that he "checks" her completion of any listed tasks each day. (Tr. at 145, 156, 265, 313). Claimant's husband also indicated that Claimant was sometimes able to go out alone to complete tasks, such as shopping. (Tr. at 289). As such, it seems that Claimant is capable of performing these activities alone with after-the-fact inspections, similar to those that might occur in a workplace setting. As for Claimant's assertion that she cannot perform tasks, such as cleaning her home, without getting distracted for hours at a time, (Tr. at 150), the ALJ noted that Claimant's husband reported she was able to watch television or movies and play computer games "pretty well," which seems to indicate she does not get distracted during those activities. (Tr. at 127, 290). Moreover, Claimant is also able to text message, e-mail, and shop effectively, which evidences that she is able to perform activities without undue distraction.

As for Claimant's ability to maintain social functioning, Listing 12.00(C)(2) states that "[s]ocial functioning includes the ability to get along with others, such as

family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. ... Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(2). Listing 12.00(C)(2) goes on to explain that "marked" limitation in this area is not defined "by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function." *Id.* With respect to this functional area, the ALJ properly emphasized that Claimant attended church, went grocery shopping at a large retail store, and used text messaging daily. (Tr. at 127, 290). Furthermore, Claimant's husband reported that they spent an abundance of time together and that Claimant attended youth sporting events and used e-mail to keep in contact with others. (Tr. at 126, 286, 290). Claimant also reported that she got along with authority figures "pretty well," and her husband echoed that sentiment. (Tr. at 292, 317). Although Claimant reported that her condition made her social behavior somewhat unpredictable, she denied ever having been fired from a job due to problems getting along with other people. (Tr. at 276, 317). Moreover, Claimant was able to work for over one month at a job requiring constant telephone contact, and she did not report leaving that job due to her lack of social functioning. In addition, it appears that Claimant attended almost all of her appointments with Dr. Saroch alone, and Claimant's attitude was consistently described as cooperative by Dr. Saroch, and at times, even sociable. (Tr. at 415, 437, 440).

With regard to Claimant's ability to maintain concentration, persistence, or pace, Listing 12.00(C)(3) provides that this functional area "refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. § 404, Subpart P, App. 1, ¶ 12.00(C)(3). Listing 12.00(C)(3) further states that "marked" limitation in this area is not defined "by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. ... [I]f you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions." *Id.* In this area, the ALJ again noted that Claimant was able to perform any physical activity so long as a list was given to her by her husband setting out the activity. (Tr. at 127). The ALJ further pointed out that Claimant was able concentrate sufficiently to drive, use public transportation, text message, use the computer to shop, shop in stores, go out alone, attend church, and follow written instructions. (*Id.*) In addition, Claimant was able to watch television, movies, and sports, although Claimant testified that she sometimes had to watch movies more than once given her lack of attention during the movie. (Tr. at 158, 290). Claimant was also able to gamble. (Tr. at 524, 613). Claimant's husband indicated that she played computer games "pretty well," and that she was able to take care of their dogs with his help. (Tr. at 287, 290). While Dr. Saroch did not regularly test Claimant's concentration or record any object findings in the area, Dr. Matin twice found that Claimant's attention and concentration were fair in January 2008, which the ALJ

noted in his RFC discussion. (Tr. at 130, 357, 359). Furthermore, at her first appointment with Dr. Saroch, Claimant's memory was described as fair (Tr. at 391).

Finally, as the ALJ pointed out in his RFC discussion, both Dr. Allen and Dr. Harlow reviewed the record and opined that Claimant was not markedly limited in any of the three functional areas. (Tr. at 556, 573). Given Claimant's reported activities, the pertinent medical records cited above, and the opinions of the state agency consultants, the undersigned **FINDS** that the ALJ's determination that Claimant did not meet the paragraph B criteria for Listing 12.04 is supported by substantial evidence.

## VIII. Recommendations for Disposition

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 14), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 15), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis

of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Chambers, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** July 20, 2015

Cheryl A. Eifert
United States Magistrate Judge